# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JESSICA COLONNA,

                Plaintiff,

v.

UPMC HAMOT and UPMC,

                Defendants.

Civil Action No. 1:16-cv-0053 (BJR)

MEMORANDUM OPINION GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT.

## I. INTRODUCTION

Plaintiff Jessica Colonna brings this action against Defendants UPMC and UPMC Hamot for alleged violations for the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et. seq.*, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* Currently before the Court is Defendants' Motion for Summary Judgment [ECF 22]. Having reviewed the parties' submissions, the record of the case, and the relevant legal authority, the Court will GRANT Defendants' Motion for Summary Judgment.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff worked as a medical records clerk and office assistant at Healthy Families, an outpatient family practice within UPMC Hamot. [ECF 21 ¶¶ 1, 10.] UPMC Hamot is a wholly-owned subsidiary of UPMC. [ECF 24-9 ¶ 2.] According to Andrea Clark Smith, the Senior Associate Counsel and Vice President Employment and Labor Group supporting UPMC and various UPMC entities, including UPMC Hamot, UPMC has a board of directors but it does not have any employees. [ECF 24-9 ¶¶ 1, 3.]

1

Plaintiff began working at Healthy Families in October 2004. [ECF 28-1 ¶ 4.] In approximately 2005 or 2006, Plaintiff changed positions to a Medical Office Assistant. [ECF 28-1 ¶ 5.] Plaintiff was responsible for checking in patients; checking out patients; registering patients; answering the phones; taking messages; scheduling follow-ups, appointments, and testing; and performing "side work" such as scanning documents, completing paperwork, and collecting money. [ECF 21 ¶ 2.] At the time of Plaintiff's termination, she was scheduled to begin work at 8:30 am each day. She was to work until 5:30 pm on Monday, until 6:30 pm on Tuesday, until 2:30 pm on Wednesday, until 5:30 pm on Thursday, and until 3:30 pm on Friday. [ECF 21 ¶ 3.] Plaintiff's home was between ten and 15 minutes by car from Healthy Families. [ECF 21 ¶ 7.][1] Plaintiff's supervisor at Healthy Families was Stacy Lossie, the UPMC Hamot Business Manager. [ECF 21 ¶ 5.]

In May 2014, Lossie noticed that Plaintiff was experiencing difficulty with her eyes and recommended that Plaintiff seek medical treatment and look into family medical leave. [ECF 21 ¶ 15.] Lossie described Plaintiff's eyes as "swollen, red eyelids, goopy. Almost compared to a severe case of pink eye is how I would relate that. It looked extremely uncomfortable." [ECF 28-1 at ¶ 25.] Lossie provided Plaintiff with the contact information for UPMC WorkPartners so that she could apply for FMLA leave. [ECF 21 ¶ 16.] On July 9, 2014, Plaintiff requested intermittent FMLA leave for her "eye condition and not being able to function in the morning" by submitting a request to UPMC WorkPartners. [ECF 21 ¶¶ 17-18.] In the medical certification for FMLA

---

[1] Plaintiff has moved for an extension of the fact discovery deadline in order to authenticate bus schedules that Defendants suggested may have assisted Plaintiff's commute to work. [ECF 19.] Because this Motion was not filed in compliance with the Court's standing order [ECF 12] and because Plaintiff has not established good cause to extend discovery, the Motion is DENIED.

Leave, Dr. Deimel, Plaintiff's physician, certified a potential need for up to four hours of intermittent leave, two times a week. [ECF 21 ¶ 19.] On July 29, 2014, UPMC WorkPartners approved Plaintiff's request. It initially approved the request for the period of June 23, 2014 until June 22, 2014 and authorized Plaintiff to take intermittent FMLA leave two times per week for four hours per event. [ECF 21 ¶ 20.] On July 31, 2014, UPMC WorkPartners amended Plaintiff's intermittent FMLA leave based on a new medical certification and authorized her to take intermittent FMLA leave five times per week for four hours per event. [ECF 21 ¶ 21.]

While Plaintiff was on FMLA leave, Plaintiff's coworkers complained that Plaintiff's lateness made them stressed, and a nurse practitioner told Plaintiff, "Maybe if you got here on time, you would know what's going on in the morning." [ECF 29 ¶ 38.] On September 8, 2014, Lossie emailed Plaintiff to explain that patients and providers were complaining because Plaintiff was not at work in the mornings. Lossie wrote, "I'm really not trying to give you a hard time. I know that these circumstances are beyond your control but something has to be done now." [ECF 24-4 at 188.] On November 5, 2014, Lossie agreed with Plaintiff in an email that some of Plaintiff's coworkers have bad attitudes. Lossie continued, "I know that they are overwhelmed at times with you not being here in the morning. However, they also cannot expect that since they worked all morning it is now your turn to do everything. They really aren't complaining about your morning absence but I think it is weighing on them subconsciously. We just all need to pull together, be friendly to each other and patients, as all of you are the front line and what patients see first." [ECF 24-4 at 189.] On January 13, 2015, Lossie emailed Plaintiff, "As you know your FMLA is already a burden to the staff. I would appreciate your arriving no later than 12:30. Sorry to have to be blunt but REALLY!!!!! There really is no excuse for you to be even a minute late." [ECF 24-4 at 201.]

3

In December 2014, Plaintiff contacted Human Resources due to text messages that she received from her coworkers regarding her use of intermittent FMLA leave, and requested that Ms. Robin Williams, an employee in Human Resources, advise Plaintiff's coworkers on the FMLA process. [ECF 21 ¶¶ 72-74.] In February 2015, Williams "went out to the practice and advised the staff there of what the purpose of [] FMLA is and what the benefits of that are [and] to educate [them] on the FMLA process." [ECF 21 ¶ 75.] After Williams trained the staff, Human Resources did not receive any further complaints from Plaintiff regarding FMLA leave. [ECF 21 ¶ 76.]

On February 27, 2015, Lossie advised Plaintiff to contact UPMC WorkPartners to "see what else she could do to continue to take care of her eyes" and to request an ADA accommodation because she was going to exhaust her intermittent FMLA leave in ten days. [ECF 21 ¶ 22.] Plaintiff's FMLA leave was exhausted on March 9, 2015. [ECF 21 ¶ 23.] Plaintiff exceeded her allotted time of intermittent FMLA by half an hour; however her supervisor took no action against her because "[they] worked together to try and figure out what [they] could do to make the situation okay for [Plaintiff] to keep her job." [ECF 21 ¶ 24.]

UPMC has a disability accommodation policy that is followed by UPMC Hamot. [ECF 26-18.] UPMC WorkPartners is responsible for reviewing an employee's request for an accommodation and engaging in the interactive process with that employee. [ECF 21 ¶ 26.] In February 2015, Plaintiff requested an accommodation from UPMC WorkPartners and started the interactive process. [ECF 21 ¶ 27.] The Request for Accommodation submitted stated, "I work on a computer all day and my eyes are very light sensitive and very dry, it is hard for me to see at times, the computer causes a lot of eye issues for me due to my condition." [ECF 26-11.] Under the prompt, "The accommodation that I am requesting is:" Plaintiff wrote, "If needed to have the

4

time to care for my eyes (the morning when it is the worst). I am on FMLA currently, that allows 4 hours 5 time[s] a week." [ECF 26-11.]

On March 12, 2015, Dr. Espander submitted a Medical Inquiry Form that was "to be completed by the treating provider" for Plaintiff. [ECF 24-3 at 137.] To the question, "Does the Employee have a disability that substantially limits a major life activity?" Dr. Espander checked "No." [*Id.*] Dr. Espander determined that Plaintiff's disability did affect her ability to perform an essential function of her position, and explained, "Patient can have problems working on the computer for long periods of time. She will need to take breaks to use eye drops." [ECF 24-3 at 138.] Dr. Espander recommended, "Patient should be able to use eye drops as needed for dryness. She may need to have her work station lighting to be adjusted. Bright lights and glare can be a problem." [*Id.*] Dr. Espander anticipated that the need for accommodation is likely to be "temporary until allergies are controlled." [*Id.*]

Kelly Dennis is the Disability Coordinator responsible for reviewing medical documentation in response to requests for accommodation under the ADA. [ECF 28-1 ¶ 49.] In her deposition, Dennis said she was employed at UPMC, and that she was responsible for all UPMC locations. [ECF 24-3 at 8, 18.] In claim notes, she identified herself as "Kelly Dennis, UPMC WorkPartners." [ECF 24-3 at 142, 148.] Plaintiff referred to Dennis as "Kelly from WorkPar [*sic*]" in her response to a Corrective Action on May 4, 2015. [ECF 24-1 at 164.] In her deposition, Plaintiff identified Dennis as "one of the contacts from the FMLA through WorkPartners." [ECF 24-1 at 51.]

In reviewing a request for accommodation, Dennis first reviews documentation to determine if the employee has a disability and then determines what accommodation is appropriate. [ECF 28-1 ¶ 50.] On March 17, 2015, Plaintiff was informed that her treating

5

physician indicated that her medical condition did not rise to the level of protection as a disability under the ADA. [ECF 28-1 ¶ 51.] Plaintiff thereafter contacted Dennis and asked her to reopen her request for an accommodation. Dennis agreed to reopen her request, and sent a Medical Inquiry Form to Dr. Gold, Plaintiff's new physician. [ECF 21 ¶ 31.]

On April 20, 2015, Plaintiff sent UPMC WorkPartners an email in which she requested an hour leeway to start work at 9:30 am, in order "to get my eyes to a point where I feel comfortable functioning/driving to work." [ECF 28-1 ¶ 55.] On May 4, 2014, Dennis spoke with Dr. Gold's nurse, who said that Dr. Gold indicated that Plaintiff was negative for an eye condition called Sjogren's Syndrome at the time, and that a lip biopsy had been inconclusive for Sjongren's Syndrome. [ECF 24-3 at 66.] The nurse told Dennis that Plaintiff was on four medications for eye drops but there was no specific morning routine or direction that drops need to be used in the morning." [ECF 24-3 at 66-67.] Having determined that Plaintiff's request for an accommodation was not medically supported, on May 6, 2015 Dennis denied the request a second time. [ECF 21 ¶ 34.]

On May 12, 2015, Dr. Gold sent Dennis a letter in which he stated that he was treating Plaintiff for Sjogren's Syndrome; she had difficulty seeing upon waking; it was dangerous for her to drive in the very early morning; and she should start work at 9 am so that she could apply her eye moisturizers and drive to work. This letter prompted Dennis to reopen the claim. [ECF 21 ¶ 35.] On May 13, 2015, Dennis sent Dr. Gold a Medical Questionnaire because she wanted to clarify how much time Plaintiff needed in the morning. [ECF 24-3 at 48.] Dr. Gold responded that Plaintiff needed 60 to 90 minutes between waking in the morning and driving to be safe, and indicated it would be an appropriate daily routine for Plaintiff to awaken at 6:00 am, apply ocular moisturizers at 6:30 am, allow one hour for eyes to clear to 7:30 am, and drive to work between

7:30 and 8:20 am to begin work at 8:30 am. [ECF 24-3 at 143.] In her deposition, Plaintiff testified she was already waking up before 6:00 am but still had issues getting to work on time. [ECF 28-1 ¶ 81.] Plaintiff was informed her accommodation request was denied on May 20, 2015. [ECF 28-1 ¶ 79.]

Prior to Plaintiff's request for an accommodation, Lossie permitted her to wear sunglasses at the practice, turned off the lights in the office, closed the blinds in the front office, and purchased two different types of anti-glare screens. [ECF 21 ¶ 43.] After Plaintiff's request for an accommodation, Lossie explored the possibility of implementing the following accommodations: changing Plaintiff's start time to 9:00 am provided that Plaintiff work until 7:30 pm either Monday or Thursday; permitting her to go on short-term disability; working part-time; and arranging for Plaintiff to ride to work with Lossie or a coworker. [ECF 21 ¶ 44.] Plaintiff declined these options because she did not have childcare available Monday evenings; she desired to maintain fulltime work status; and alternative transportation options would still have required her to function early in the morning when her vision was obscured. [ECF 21 ¶ 45.]

UPMC Hamot has an Attendance and Tardiness Policy, which was in effect from January 27, 2012 until the present. Lossie was responsible for enforcing this policy. [ECF 21 ¶ 46.] The policy provides that an employee who is absent or tardy three times in a period of 120 days will receive a supervisory counseling; an employing who is absent or late three more times within 120 days from the supervisory counseling will receive a first warning; an employee who is absent or late one more time within 120 days from the first warning will receive a final warning; an employee who is absent or late one more time within 120 days from the last warning will be terminated. [ECF 21 ¶ 48.] UPMC Hamot utilizes Kronos, a timekeeping system, to track late arrivals or absences, and employees must clock in and clock out of the system. [ECF 21 ¶ 49.]

7

In February 2015, Lossie had a meeting with her managers in which the managers discussed the need to follow the Attendance and Tardiness Policy. The managers told Lossie that she needed to take corrective action if employees are not following the policy. [ECF 21 ¶ 51.] Prior to this meeting, Lossie "was very lenient about [the staff's] clocking in and clocking out, [she] did a lot of hand-slapping, not a lot of disciplining." [ECF 21 ¶ 52.] After the meeting, Lossie scheduled a staff meeting and informed her employees, including Plaintiff, that she would begin implementing and enforcing the time and attendance policy. [ECF 21 ¶ 54.] There were no employees who were late three or more times after the staff meeting and not disciplined. [ECF 21 ¶ 71.] After Plaintiff exhausted her FMLA intermittent leave, Lossie refrained from implementing the time and attendance policy against Plaintiff for four weeks, from March 9, 2015 through April 13, 2015, as an adjustment period for Plaintiff to figure out how to get to work on time. [ECF 21 ¶ 47.]

On April 20, 2015, Plaintiff received a supervisory counseling because she had been late four times the previous week. [ECF 28-1 ¶ 91.] On these occasions she was 13, 9, 19, and 28 minutes late. [*Id.*] In the employee comments section of the corrective action, Plaintiff explained that she was on FMLA and was waiting for her ADA paperwork to be completed because of her eye issues, and "I really try my hardest to be here before/at my scheduled time, but it is very hard for me to predict how my eyes are going to be day to day. There are times when I have to pull over when driving to work, due to the sun or just my eyes fogging up, until I can see better." [ECF 28-1 ¶ 92.] On April 28, 2015, Plaintiff was provided a written warning for three additional late arrivals, which were 24, 15, and 18 minutes tardy. [ECF 28-1 ¶ 93; ECF 24-1 at 162.] In the employee comments section, Plaintiff repeated that she was working on completing ADA paperwork for her eyes and requested "to talk to someone in HR at UPMC Hamot in re: to getting

8

some guidance on my situation." [ECF 24-1 at 162-63.] On May 4, 2015, Plaintiff received a final warning for two additional late arrivals, of 37 and 13 minutes. [ECF 28-1 ¶ 95; ECF 24-1 at 164.] In the employee comments section, Plaintiff wrote that she "was contacted by Kelly [Dennis] from [W]ork[P]artners" and hoped to speak to her the following morning about her ADA paperwork. [ECF 28-1 ¶ 96.] Plaintiff had arrived late to work ten times between May 7, 2015, and May 20, 2015, but UPMC Hamot did not proceed with corrective action because she was still engaged in the interactive process with UPMC WorkPartners. [ECF 21 ¶¶ 62-63.] Plaintiff was informed her accommodation request was denied on May 20, 2015. [ECF 28-1 ¶ 79.] On May 21, 2015, Plaintiff was informed she was being terminated for tardiness. [ECF 28-1 ¶ 98.] No one outside of UPMC Hamot had any role with respect to making this decision or any other decision that related to Plaintiff's employment. [ECF 21 ¶ 65.]

On March 3, 2016, Plaintiff filed a complaint alleging violations of the Family & Medical Leave Act and violations of the Americans with Disabilities Act. Defendants' Motion for Summary Judgment is now ripe.

## III. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In considering a motion for summary judgment, "a court does not resolve factual disputes or make credibility determinations, and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d

1125, 1127 (3d Cir. 1995). A motion for summary judgment will be denied only when there is a genuine dispute of material fact, *i.e*., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005).

## IV. DISCUSSION

### A. UPMC Is Entitled to Summary Judgment.

In order to be subject to the FMLA, an employer must have at least 50 employees. 29 U.S.C. § 2611(4). To be subject to the ADA, an employer must have at least 15 employees. 42 U.S.C. § 12111(5). UPMC has a board of directors, but no employees. [ECF 24-9 ¶¶ 1, 3.] Plaintiff was employed by UPMC Hamot, a separately incorporated and wholly-owned subsidiary of UPMC. [ECF 24-9 ¶ 2.] A parent company is only liable for a subsidiary's discriminatory act when the company has split itself into entities with less than fifteen employees in order to evade the statutes' reach; when the parent company has directed the subsidiary's discriminatory act; or when the parent company and subsidiary are "substantively consolidated." *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 85-86 (3d Cir. 2003.) Substantive consolidation may be found by analyzing operational factors such as (1) the degree of unity between the entities with respect to ownership, management (both directors and officers), and business functions (*e.g.,* hiring and personnel matters); (2) whether they present themselves as a single company such that third parties dealt with them as one unit; (3) whether a parent company covers the salaries, expenses, or losses of its subsidiary; and (4) whether one entity does business exclusively with the other. *Id.* at 87.

The first exception does not apply because there is no dispute that UPMC Hamot is subject to the FMLA and ADA, and thus Defendants have not arranged themselves to avoid the statutes' reach. The second exception does not apply because no one outside of UPMC Hamot had any role with respect to Plaintiff's termination or any other decision that related to Plaintiff's employment.

10

[ECF 21 ¶ 65.] Plaintiff maintains that Kelly Dennis, the disability coordinator who denied Plaintiff's accommodation request, is an employee of UPMC. The record leaves no doubt, however, that Dennis was employed by UPMC WorkPartners, a separate entity. [*See* ECF 24-1 at 51, 164; ECF 24-3 at 142, 148; ECF 24-9 ¶ 3.] Finally, the third exception does not apply because the record is void of any evidence implicating the substantive consolidation factors enumerated in *Nesbit*. Summary judgment is granted in favor of UPMC.

### B. Plaintiff's FMLA Interference Claim is Dismissed.

To make a claim of interference under the FMLA, a plaintiff must establish: (1) she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which she was entitled under the FMLA. *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014). The fifth factor is absent here: Plaintiff was not denied benefits to which she was entitled. She applied for and was granted intermittent FMLA leave, beginning on June 23, 2014, which lasted through March 9, 2015. Plaintiff does not allege that she was entitled to additional leave, and Plaintiff acknowledges that no one in Human Resources criticized or said anything negative about Plaintiff taking FMLA leave. [ECF 21 ¶ 77.]

Instead, Plaintiff suggests Defendant interfered with her ability to take FMLA leave in the future by terminating her employment. [ECF 1 ¶ 36.] However, a claim based on her firing is properly regarded as one of retaliation, not interference, under the FMLA. *See Lichtenstein v. University of Pittsburgh Medical Center*, 598 F. App'x 109, 114 (3d Cir. 2015). Summary judgment is granted to Defendants on her interference claim.

11

**C. Plaintiff's FMLA and ADA Retaliation Claims are Dismissed.**

To prevail on a retaliation claim under the FMLA, the plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights. *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294 (3d Cir. 2012). "To demonstrate causation, Plaintiff must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination." *Inella v. Lenape Valley Found.*, 152 F. Supp. 3d 445, 458 (E.D. Pa. 2015) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279-81 (3d Cir. 2000)). "The requisite causal connection can be established by (1) temporal proximity between the protected activity and the adverse employment action; (2) circumstantial evidence of a 'pattern of antagonism' following the protected conduct; or (3) where the proffered evidence, looked at as a whole, suffices to raise the inference." *Id.*

A causal connection can be demonstrated through direct evidence or circumstantial evidence. *See Trijillo-Cummings v. Public Serv. Co.*, 173 F.3d 864 (10th Cir. 1999). Claims based on circumstantial evidence proceed under the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Lichtenstein*, 691 F.3d at 302.[2] Under that test, a plaintiff must first prove a *prima facie* case of discrimination to survive

---

[2] A plaintiff may proceed on a "pretext theory," in which the plaintiff claims that an employer's stated justification for an employment decision is false, or a "mixed-motive" theory, in which the plaintiff claims that an employment decision was based on both legitimate and illegitimate reasons. *Egan v. Delaware River Port Authority*, 851 F.3d 263, 268 n.1 (3d Cir. 2017). The difference is in the degree of causation that must be shown: in a "mixed-motive" case, the plaintiff must ultimately prove that her protected status was a "motivating" factor, whereas in a non-mixed-motive or "pretext" case, the plaintiff must ultimately prove that her status was a "determinative" factor. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 788 (3d Cir. 2016). Plaintiff explicitly advances a pretext theory [*see, e.g.*, ECF 27, Pl. Br. at 27], but Defendant would be entitled to summary judgment even under the more lenient mixed-motive framework. To prevail on a mixed-motive theory, Plaintiff must present evidence "from which a reasonable jury could conclude that [Defendant] had legitimate and illegitimate reasons for its employment decision and that [Plaintiff's] use of FMLA leave was a negative factor in the employment decision." *See Egan v. Delaware River Port Authority*, 851 F.3d 263, 275 (3d Cir. 2017). As discussed *infra*, Plaintiff has failed to produce any evidence suggesting Plaintiff's use of FMLA leave was a factor in her termination. Because the Third Circuit's recent decision

12

summary judgment. The burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. 411 U.S. at 802. If the defendant meets its burden of production, any presumption of discrimination drops from the case and the plaintiff has the burden to adduce evidence from which a factfinder could reasonably disbelieve the employer's articulated reasons for the action. *Id.* at 804.

Plaintiff is unable to point to evidence in the record sufficient to create a genuine factual dispute about causation. She acknowledged that her discharge was the result of her late arrivals and that Defendant's tardy log was accurate. [ECF 24-1 at 26.] After Lossie recommended that Plaintiff look into taking family medical leave and provided contact information for UPMC WorkPartners, Plaintiff requested FMLA leave on July 9, 2014. [ECF 21 ¶¶ 15-18.] Plaintiff's intermittent FMLA leave was exhausted on March 9, 2015, and she was not terminated until more than two months later, on May 21, 2015. [ECF 21 ¶ 23; ECF 28-1 ¶ 98.] There is no evidence of a pattern of antagonism following Plaintiff's request or use of FMLA leave. Thus, there was no temporal proximity between Plaintiff's request or use of FMLA leave and her termination.

Further, while Plaintiff received complaints from coworkers about her tardiness while she was on FMLA leave, in February 2015 a Human Resources employee educated Plaintiff's coworkers on the FMLA's purpose and process, after which Plaintiff did not submit any further complaints about her coworkers. [ECF 21 ¶¶ 72-76.] When Lossie admonished Plaintiff during her FMLA leave, it was for arriving to work even later than her FMLA leave permitted. [ECF 24-4 at 201.] And there is no evidence that Plaintiff was treated differently than similarly situated coworkers. After Lossie announced in February 2015 that she would be enforcing the Attendance

---

in *Egan* discussing the mixed-motive framework does not apply here – and even if it did, plainly would not affect the outcome – Defendant's motion to file supplemental briefing on the decision [ECF 31] is DENIED.

and Tardiness Policy, there were no other employees who were late three or more times and not disciplined. [ECF 21 ¶ 71.] In fact, Plaintiff alone was excused from discipline for tardiness from March 9, 2015 to April 13, 2015, during her adjustment phase, and from May 7, 2015 to May 20, 2015, while her ADA accommodation request was pending with UPMC WorkPartners. [ECF 21 ¶¶ 47, 62-63.] Plaintiff enjoyed the full benefits of her FMLA leave, and she has not adduced evidence to establish a *prima facie* case of retaliation.

The same standard applies under the ADA. In order to establish a *prima facie* case of retaliation under the ADA, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Mascioli v. Arby's Restaurant Group, Inc.*, 610 F. Supp. 2d 419, 447 (W.D. Pa. 2009). Because Plaintiff has failed to point to evidence suggesting her termination was caused by anything other than her late arrivals, summary judgment is granted on both Plaintiff's FMLA and ADA retaliation claims.

### D. Plaintiff's ADA Discrimination and Reasonable Accommodation Claims Are Dismissed.

The ADA prohibits an employer from discriminating against "a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must therefore show "(1) [s]he is a disabled person within the meaning of the ADA; (2) [s]he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [s]he has suffered an otherwise adverse employment decision as a result of discrimination." *Williams v. Philadelphia Housing Authority Police Dept.*, 380 F.3d 751, 761 (3d Cir. 2004).

The ADA defines "disability" to mean: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). Regulations provide that "[t]he primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii). Moreover, "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." § 1630.2(j)(1)(vi).

Plaintiff claims she is disabled because her eye condition substantially limits her ability to participate in major life activities such as driving, reading, and seeing. Because Plaintiff's ability to perform essential job duties without accommodation will be determinative, the Court will indulge the instruction to avoid extensive analysis at this phase and assume that Plaintiff is disabled.

Second, Plaintiff must establish that she is a "qualified individual." "The term 'qualified,' with respect to an individual with a disability, means that the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. 1630.2(m). This determination requires a two-part inquiry: "First, a court must determine whether the individual satisfies the requisite skill, experience, education and other job-related requirements of the employment position that such individual holds or desires." *Deane v. Pocono Medical Center*, 142 F.3d 138, 145 (3d Cir. 1998).

"Second, it must determine whether the individual, with or without reasonable accommodation, can perform the essential functions of the position held or sought." *Id.* Because UPMC Hamot does not dispute Plaintiff's general qualifications as a medical records clerk and office assistant, only the second prong is relevant. Under this analysis, the Court first "must consider whether the individual can perform the essential functions of the job without accommodation. If so, the individual is qualified (and, *a fortiori*, is not entitled to accommodation). If not, then a court must look to whether the individual can perform the essential functions of the job with a reasonable accommodation." *Id.* at 146.

Punctuality is an essential function for an employee like Plaintiff, whose presence in the office is vital to process patients who are arriving in the morning. *See Miller v. Univ. of Pittsburgh Medical Center*, 350 F. App'x 727, 729 (3d Cir. 2009) ("Attendence can constitute an essential function under the ADA") (citing *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899-900 (7th Cir. 2000) ("Common sense dictates that regular attendance is usually an essential function in most every employment setting; if one is not present, [s]he is usually unable to perform [her] job.")). The record reveals that Plaintiff did not require an accommodation from her employer in order to arrive on time to work in the mornings. In *Bush v. Donahue*, 964 F. Supp. 2d 401 (W.D. Pa. 2013), this Court granted summary judgment to the defendant in a disability discrimination case after recognizing that the plaintiff's sprained ankle did not prevent her from driving because she was able to remove her protective boot and wear a regular shoe to drive. 964 F. Supp. 2d at 421.[3]

---

[3] In *Bush*, the Court held that the plaintiff failed to satisfy the first prong of ADA discrimination analysis because she failed to provide evidence of an actual disability. 964 F. Supp. 2d at 421. But because the relevant regulation provides "[t]he determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures," 29 C.F.R. § 1630.2(j)(1)(vi), the discussion of whether a plaintiff

16

Here, Plaintiff requests an accommodation because her extremely dry eyes make it difficult for her to see when she wakes up in the morning, and she "really just need[s] maybe an hour leeway if needed to get my eyes to a point where I feel comfortable functioning/driving to work." [ECF 28-1 ¶ 55.] But just as Bush was able to drive to work by changing out of her boot, Plaintiff could safely drive to work by waking up earlier in the morning. Dr. Gold confirmed that Plaintiff needed 60 to 90 minutes between waking in the morning and driving to be safe. [ECF 24-3 at 143.] Because Plaintiff lived a ten to fifteen drive from work [ECF 21 ¶ 7], she would not have been required to wake at a prohibitively early hour to apply her ocular moisturizers and arrive to work by 8:30 am. Plaintiff had been disciplined for late arrivals of 13, 9, 19, 28, 24, 15, 18, 37, and 13 minutes. [*See* ECF 26 Ex. S, T, and U.] This is not a case where a plaintiff claims she is disabled because her vision fails at unpredictable hours (or predictable hours when she is at work). The record reveals that Plaintiff was able to perform her work once she arrived, and her ability to drive to work would not be affected if she awoke and applied her moisturizers approximately 30 minutes earlier each morning. When an employee, as here, can manage and overcome her limitations with minor effort, she does not require an accommodation for purposes of the ADA. Because Plaintiff could perform the essential functions of her job without accommodation, *a fortiori* she was not entitled to an accommodation, *Deane*, 142 F.3d at 146, and UPMC Hamot did not discriminate against her by denying an accommodation. *See Dudley v. N.Y. City Hous. Auth.*, 2014 WL 5003799, at \*35 (S.D.N.Y. Sept. 30, 2014) (granting defendant's summary judgment motion on plaintiff's disability discrimination claim because plaintiff's "alleged disability did not prevent him from arriving at work on time. Simply leaving for work earlier would have allowed him to

---

can mitigate her impairment is more appropriate under the second prong of the analysis, whether she can perform essential job functions with or without reasonable accommodation.

17

meet his start time each day. His supervisors . . . were not required to permit him to work later hours simply because that would have been more convenient for [plaintiff]. [Plaintiff's] desire to begin working an hour and a half later amounts to nothing more than a preference, which is not actionable under the disability discrimination statutes.").

Nor did UPMC Hamot violate the ADA by failing to engage in an interactive process in good faith, as Plaintiff argues. "[A]n employer has a duty under the ADA to engage in an 'interactive process' of communication with an employee requesting an accommodation so that the employer will be able to ascertain whether there is in fact a disability and, if so, the extent thereof, and thereafter be able to assist in identifying reasonable accommodations where appropriate." *Williams*, 380 F.3d at 722. "[W]here a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant. . . . The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." *Mengine v. Runyon*, 114 F.3d 415, 420 (3d Cir. 1997) (quoting *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)). Because Plaintiff does not have a viable accommodation claim, her interactive process claim necessarily fails as well.

Even assuming that UPMC Hamot's communications with Plaintiff require scrutiny, a review of the record reveals that Defendant acted conscientiously and in good faith throughout the process. Ten days before Plaintiff's FMLA leave would be exhausted, Lossie advised Plaintiff to contact UPMC WorkPartners to request an ADA accommodation. [ECF 24-4 at 34.] UPMC WorkPartners reviewed Plaintiff's request for a reasonable accommodation three times, reopening her case each time she contacted the disability specialist or provided additional information about her health condition. [ECF 21 ¶¶ 30, 31, 35.] Dennis called Plaintiff on three occasions to discuss

her medical treatment. [ECF 24-3 at 145-46.] Dennis confirmed with Dr. Gold that an accommodation was not necessary because Plaintiff could perform her essential job functions simply by awaking earlier in the morning. [ECF 24-3 at 143.] Lossie did not penalize Plaintiff for late arrivals while Plaintiff was engaged in the interactive process with WorkPartners [ECF 21 ¶¶ 62-63], and Lossie offered to arrange for Plaintiff to ride to work with Lossie or a coworker. [ECF 21 ¶ 44.] This good faith engagement and communication entitles Defendant to summary judgment.

## V. CONCLUSION

For the foregoing reasons, the Court HEREBY:

1. **DENIES** [19] Plaintiff's Motion for Extension of Time to Complete Discovery;

2. **GRANTS** [22] Defendants' Motion for Summary Judgment; and

3. **DENIES** [31] Defendants' Motion for Leave to File Supplemental Briefing.

The case is **CLOSED**. The Clerk shall send copies of this Order to the parties.

Dated this 25th day of September, 2017.

*Barbara J. Rothstein*

Barbara Jacobs Rothstein
U.S. District Court Judge